SHERMAN HUNT, *et al.*

*v.*

CLEE ALLEN, *et al.*

(No. 10022)

Submitted April 13, 1948.  Decided June 22, 1948.

*A. G. Mathews,* for plaintiffs in error.

*Clair Smith, Grover F. Hedges, Hedges & Hedges,* for defendants in error.

KENNA, JUDGE:

This proceeding was brought under the provisions of Code, 6-6-7, in the Circuit Court of Roane County by Sherman Hunt, Russell Hunt, Paul L. Cottrell, W. E. Ellison, M. V. Anderson, Otho Wells and R. R. Starcher, alleged to be voters of Roane County, against Clee Allen, Elmer Walker, Opie Hunt, H. D. McKown and Ralph Daugherty, the present members of the Board of Education of Roane County, for the purpose of having the defendants removed from office as members of that board. Demurrer was sustained to the original petition and upon the incoming of an amended petition and renewal of demurrer the court proceeded to the taking of proof and the hearing of the matter upon its merits, thus in effect overruling the demurrer to the amended petition. There are a number of preliminary questions raised by motion and special plea which will be considered before the questions going to the merits.

The first procedural point is that the petition was not verified as is required by Code, 6-6-6, the defendants below taking the position that that section controls as to the form of the petition required ·and citing *Wysong* v. *Walden,* 120 W. Va. 122, 196 S. E. 573, as sustaining that position. The language quoted from the *Wysong* case is as follows:

> "(2) One of the grounds of the motion to quash is that the petition was signed with a typewriter and not personally. The statute (Code, 1931, 6-6-6) provides that the charges 'shall be reduced to writing and signed by a citizen or citizens of this State, and verified by the affidavit of one or more of the signers' . . . we are of opinion that the petition, so far as the signing thereof, is sufficient."

The language is correctly quoted from the South Eastern Reporter but the language of the opinion as it appears· in 120 W. Va. at page 125 is very different. There it reads:

> "One of the grounds of the motion to quash is that the petition was signed with a typewriter and not personally. The statute (Code, 1931, 6-6-7) provides that, in the case of the removal of any county officer, the charges shall be reduced to writing, and the same 'may be preferred, * * * by * * * any five or more voters' of the county. * * *".

Of course, where a difference appears between an opinion appearing in the South Eastern Reporter and the same opinion as it appears in our official reports, this Court is obliged to adhere to the West Virginia Reports. It will be observed that the official report refers to Code, 6-6-7 as controlling the procedural requirements and not to Code, 6-6-6. The controlling statute as adopted in the *Wysong* case as officially reported does not require that a petition for the removal of county officers shall be verified. Code, 6-6-6, deals with the removal of State officers by a proceeding before the Governor and does expressly require a verified petition.

The next question is whether in the absence of a formal written denial the allegations of the petition are to be taken as true, requiring the removal of the defendants from office. This is entirely a statutory proceeding and there is little or no precedent concerning the required procedure. The statute, after requiring that the charges be reduced to writing and that a summons issue against the person who is sought to be removed, returnable to a certain day, provides that he shall appear and answer the charges on the day to be named in the summons. While we are of the opinion that a proceeding of this nature for the expulsion of public officers should not be entirely shorn of dignity and formality by a complete departure from the general rules governing legal proceedings, we do believe that the removal of a public officer from his position should not be in the nature of a judgment by default. We are of the opinion that material charges contained in the petition must be proved regardless of whether denied by answer or not. Consequently there was no error in the appearance of the defendants in answer to the summons and the demand that

the charges against them be proved and in the Circuit Judge of Roane County proceeding to hear the charges in the absence of an answer in writing.

The defendants below now say that the petition should be dismissed because the petitioners have not proved the allegations contained therein that they are voters of Roane County as required by Code, 6-6-7. This is simply a formal allegation in compliance with the statutory requirements which does not go to the nature of the charges preferred nor to the other matters in which the absence of information might result in prejudice to the persons against whom the proceeding is brought. We therefore believe, although we have just held to the contrary concerning the material allegations of the petition, that in mere matters of form or matters that go only to the procedural requirements as distinguished from the issue on the merits, that the provisions of Code, 56-4-60, concerning bills of complaint should be held to apply to merely formal allegations of jurisdictional facts.

The remaining questions for decision we believe are reduced to four which we will attempt to clarify in the following statement.

The record shows that during the fiscal year 1946-47 the five defendants were members of the Board of Education of Roane County and that during that year Opie Hunt was engaged in the general merchandise business in the Town of Walton and that he there sold and delivered for use in their respective hot lunch programs to the principals of the Walton High School and of the Walton Graded School certain groceries and supplies, the sale prices of which aggregated for the school year $2,913.50. Hunt's statements for these supplies were not sent to the principals of these schools but were forwarded to the board of education and paid by it by means of drafts drawn on the Sheriff of Roane County and payable from the "general current expense fund" of the board of education. It is shown that Hunt received the money in payment of these drafts. It is also shown that the money so spent was in no way a part of the tax return of the State of West Virginia nor of any of its govern-

mental units, but was a part of a fund contributed by the Federal government in sponsoring a hot lunch program, available to all our public schools at that time. Since the principal question raised by the defendants turns upon whether Code, 61-10-15, applies to the spending of Federal money under the auspices of the State of West Virginia or is confined solely to money belonging either to the State of West Virginia or to one of its governmental units, it becomes necessary to state in general the showing of this record concerning the manner in which the Federal hot lunch program was carried out.

Emphasizing that we are speaking from the showing made by this record largely through the testimony of Mr. Kenneth Shaffer, County Superintendent of Schools of Roane County and Secretary of the Board of Education since July 1, 1946, the beginning of the fiscal year in which the circumstances here involved arose, it would seem that participation in what will be called the hot lunch program of the Federal government was optional on the part of the institutions to which participation was available. If the school elected to take part a charge for the lunches was established, in this instance nine cents with milk and seven cents without. The charge was collected only from the students who could pay and those that could not pay were served without charge. The money actually collected seems to have been spent in the purchase of supplies for the lunch program under the direction of the principal of the school involved. Since some of the children did not pay, the amount collected did not pay for the necessary supplies. How this money was treated as a matter of bookkeeping does not appear from the record. The difference between the total cost and the amount collected by the school involved was represented by charge accounts carried on the books of local merchants in the name of the school, statements of which were sent to the board of education and certified to the State Department of Education by its secretary with the approval of the State supervisor of the school lunch program, upon a form prepared by the State Department of Education and called "Claim for Reimburse-

ment". Attached to the claim were the detailed statements of the local merchant who had sold the supplies in question to the local school, the aggregate of which equalled the amount of the claim. Since these statements remained unpaid to the local merchants in the actual method of operating the hot lunch program the claim was treated as a direct application for payment by the merchant himself and was not a claim for reimbursement to anyone. The State Department of Education forwarded the claims to the Federal authorities and received a remittance with which to pay what was the entire amount remaining unpaid on a state wide basis. This fund was distributed by the State Department of Education to the different county boards of education by deposits to their credit with the sheriffs of the various counties in the board's current expense funds and the unpaid bills were met by drafts drawn by the local boards of education on that deposit. According to the showing of this record it was under this method of operation that Opie Hunt received cash and pecuniarily benefited from the drafts of the Roane County Board of Education of which he at the time was a member.

The provision of Code, 61-10-15, which the petition alleges that Opie Hunt has violated, reads as follows:

"It shall be unlawful for any member of a county court, overseer of the poor, district school officer, secretary of a board of education, supervisor or superintendent, principal or teacher of public schools, or any member of any other county or district board, or for any county or district officer to be or become directly or indirectly, pecuniarily interested in the proceeds of any contract or service, or in furnishing any supplies in the contract for, or the awarding or letting of, which as such member, officer, secretary, supervisor, superintendent, principal, or teacher, he may have any voice, influence or control." * * *

The material contentions of the defendants are, first, that the section just quoted covers only funds administered by boards of education in their official capacity as such, and consequently that it does not cover Federal money going through their hands pursuant to the terms

of a Federal statute; second, that the money in question was not paid out by the board of education pursuant to a contract such as is contemplated by the statute in question under the holding of this Court in *Myers* v. *Nichols,* 98 W. Va. 37, 126 S. E. 351; and third, that it is not shown that Hunt received for the goods sold by him an excessive profit and consequently that there was no corruption nor moral wrong involved in his sales.

Not only are the questions here involved of first impression in this jurisdiction but diligent search has failed to reveal a dependable precedent in other jurisdictions. An examination of the Federal statute (42 U. S. C. A. § 1751-1760) creating the lunch program shows that Federal agencies are charged with the duty of keeping the funds devoted to the hot lunch program under surveillance and their misappropriation beyond question would constitute a Federal offense. The Federal statute requires that the amount received by a state from the Federal appropriation be matched by the recipient. This was done in this State by Chapter 11 Acts of 1945. When and how the State and Federal funds became in fact mingled does not appear. However, in our opinion the fact that a part of the fund is to be regarded as Federal money as long as it can be identified as such does not prevent the application of Code, 61-10-15, to transactions in which it is involved. We think that the Congress in adopting the act creating the hot lunch program pursuant to which the appropriations were made and placed in the hands of State agencies to spend, expected Federal money to receive equal protection with that of the State when spent. Whatever Federal regulations were imposed were intended to be in addition to the fiscal procedure and methods required by local statutes. Code, 61-10-15, is one of the regulatory local statutes. Consequently, it is our opinion that money spent in the maintenance of the hot lunch program, though a Federal fund, must be spent subject to its provisions.

On the second point having to do with the necessity of a contract required by the specific wording of Code, 61-10-15, we are of the opinion that the allegations of the

petition and the proof in this matter are sufficient to establish the existence of a contract within contemplation of the statutory inhibition. The case of *Myers* v. *Nichols,* 98 W. Va. 37, 126 S. E. 351, had to do only with the sufficiency of the petition which alleged the sale to the county court of which Nichols was a member by the firm of Walters & Nichols and failed to allege that Nichols either knew of the sale at the time it was made or had a contract with the county court that included the transaction in question. The opinion held in effect that the petition was insufficient to connect the defendant Nichols with the transaction alleged to be a violation of the statute in question, although the single syllabus point is based upon the insufficiency of the petition to inform the defendant of what he is required to answer. In this case Hunt was fully informed and the transactions in question were transactions with him individually and in most instances he was present at the meeting of the board of education which approved his statements and ordered them paid. Apparently the appellees are contending that Code, 61-10-15, contemplates an executory contract, the execution of which would involve a number of transactions, ignoring the fact that the sale of goods itself is a contract, though entirely executed if accompanied by delivery and payment. Here the occasional transactions upon which the periodic statements of Opie Hunt to the Board of Education of Roane County were based were not each fully executed contracts, but went to make up what was in effect an open running account of the board of education. True, the negotiations were conducted by Opie Hunt and the principals of the Walton High School and of the Walton Graded School who testified that they regarded themselves personally responsible. No goods were charged to them and no statements were rendered in their names. They advanced nothing for which they were reimbursed. They were employed by and represented the Roane County Board of Education to whom Opie Hunt's statements were forwarded for payment and from that board payment was accepted. We think it is perfectly clear that Hunt had a pecuniary interest in a

contract made by him with the board of education of which he was a member.

As to the third question involving whether or not the contracts of Hunt were corrupt and involved moral wrongdoing, we believe the simple answer is that his conduct was unlawful because forbidden by statute or was *malum prohibitum* as distinguished from *malum in se.* Membership of a board of education is a matter of high public trust charged with the most sacred governmental duty known to us. The office should be filled by persons of the highest character procurable and our Legislature has undertaken to throw safeguards around that office in order that the discharge of its high responsibilities shall be jeopardized as little as possible. Code, 61-10-15, is one of these safeguards. It forbids a pecuniary interest by a member of the board of education in any contract with the board. As we have already pointed out, it goes far beyond imposing a penalty upon actual corruption. It recognizes as a matter of public policy that a pecuniary interest might, and in many instances would, subject members of boards of education to harmful suspicion of corruption and that in some instances there would be created a borderland where the distinction between honesty and corruption would not be pronounced. Wishing to avoid discriminations that might result from considering the question of degree, our Legislature very wisely forbade members of boards of education from having a pecuniary interest directly or indirectly in any sort of a contract with a board of education of which they were a member, providing that it should be a criminal offense to do so. This we think Opie Hunt has done and by so doing has forfeited his office as a member of the Roane County Board of Education.

So much for the case presented as against Opie Hunt. The other four members of the board of education were not proceeded against for the violation of Code, 61-10-15, but were accused of misconduct and malfeasance in public office in violation of the provisions of Code, 6-6-7, and related sections. For a correct grouping of the sections involved see *Arbogast* v. *Shields,* 123 W. Va. 167, 14 S. E.

2d. 204. The petition in effect charges that Hunt while a member of the board of education violated a criminal statute and thereby forfeited his office pursuant to the express terms of the statute violated. The question now before this Court is whether the other members of the board of education who knowingly participated and approved Hunt's conduct by ordering his statements paid by drafts of the board payable to him personally, can have their course of conduct approved as not being misconduct in office. The defendants rely upon the case of *Haislip* v. *White,* 124 W. Va. 633, 22 S. E. 2d. 361, in which this Court held that a member of the Board of Education of Logan County not shown to have, directly or indirectly, a pecuniary interest in the transaction under consideration could not be held to have forfeited his office by the violation of Code, 61-10-15, nor guilty of misconduct in office for participating in the employment of the wives of other members of the board as teachers, it not being shown that either of the two teachers involved was incompetent. Unfortunately the petition in the *Haislip* case is not now in the file, but apparently the charge against Williams rested upon a violation of Code, 6-6-1, by the employment of an incompetent in violation of the express terms of that section. Here the charge is much more sweeping, including official misconduct under its general definition and not confined to what the section in question provides it shall include. An examination of the petition in this matter plainly shows that the other four members of the Board of Education of Roane County are not accused of having violated the terms of Code, 61-10-15, but are accused of official misconduct in that they knowingly approved the violation of that section by Hunt. We think this record shows quite plainly that the other four members of the board by the allowance of Hunt's statements which showed on their face the merchandise furnished by him, the school to which it was supplied and the fact that it came from Opie Hunt's place of business, knowingly approved the commission of a misdemeanor. Furthermore, the misdemeanor committed by Hunt and approved by the board involved the violation of a statute,

punitive in terms and intended to control their official conduct. This Court is unable to devise a plausible theory under which such an occurrence could meet with judicial sanction. For a discussion of what constitutes misconduct in public office see *Wysong* v. *Walden,* 120 W. Va. 122, 196 S. E. 573.

The five members of the board of education are also charged with having employed in December, 1946, one Edgar S. Tomer as a teacher of Institutional on-the-Farm Training Program for Veterans, the petition taking the position that at the time of his employment Tomer was an incompetent because on October 17, 1944, the County Court of Roane County had appointed Bernice Tomer, his wife, his committee, and that the committee had never been discharged nor the order revoked. In answer to this charge, several young men that Tomer had instructed, two of his co-instructors and his family physician unqualifiedly testified concerning his mental capacity and efficiency as an instructor. There was no proof to the contrary. The appointment of a committee is not conclusive as to the competence of the subject to earn a livelihood or to engage in varieties of employment. If the actual showing concerning the particular individual is satisfactory, as here, it cannot be held that his employment was misconduct in office. Furthermore, it is not shown that the board of education had actual notice of the appointment of a committee for Tomer and in the matter of employment they are plainly not charged with constructive notice. In addition to what has been said, Code, 27-9-1, provides for the appointment of a committee for persons found to be insane or to be mentally defective, the latter classification not having been defined. At the time of the appointment of his committee Tomer was not a resident of the State of West Virginia and while the statute in question does not restrict the power of county courts to insane persons or mental defectives who are residents of the State of West Virginia, it is to be seriously questioned to what extent the power of appointment, as well as the effect of notice, can be extended to nonresidents of this State so that the appointment here would

be recognized as binding in the state of residence.

On the basis of the foregoing the order of the Circuit Court of Roane County dismissing this proceeding is reversed and the case remanded with direction to that court to enter its order removing Clee Allen, Elmer Walker, Opie Hunt, H. D. McKown and Ralph Daugherty from office as members of the Board of Education of Roane County.

*Reversed and remanded.*